IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN G. OTSYULA,

                    Plaintiff,                           CV-07-1390-ST

         v.                                 FINDINGS AND
                                                      RECOMMENDATION

OREGON DEPARTMENT OF STATE LANDS,

                    Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, John G. Otsyula ("Otsyula"), appearing *pro se,* alleges that his former

employer, defendant Oregon Department of State Lands ("DSL"), discriminated against him on

the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964,

42 USC § 2000e-5.[1]  His Amended Complaint alleges that DSL subjected him to disparate

---

[1] The Amended Complaint also alleged a claim for age discrimination pursuant to the Age Discrimination in Employment Act of 1967, 29 USC §§ 621-634 ("ADEA").  The court previously dismissed this claim without prejudice to refile in state court on the basis that the State of Oregon has not waived its sovereign immunity for ADEA claims (docket #24).  It is not properly before this court.

treatment and a hostile work environment because he is black and from Kenya. He also alleges

that DSL retaliated against him when he complained of their illegal conduct. This court has

jurisdiction over his claims pursuant to 42 USC § 2000e-5(f) and 28 USC § 1331.

DSL moves for summary judgment in its favor on all claims (docket #37). This motion

should be granted.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law." The moving

party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986). Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing

FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The

court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party." *Id* (citation omitted). In employment discrimination cases "very little

evidence" is required to survive summary judgment "because the ultimate question is one that

can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. " *Schnidrig v. Columbia Mach.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTS

Otsyula began his employment with DSL in February 2005 as a Resource Coordinator. Otsyula Depo., p. 10.  His responsibilities included processing and enforcing removal fill applications.  *Id*.  When he started, he was supervised by Lori Warner Dickason ("Dickason").  In July 2005, Dickason provided Otsyula with a performance appraisal covering February through June 2005.  Mattson Aff., ¶ 2, Ex. 2.  This appraisal states that Otsyula "meets expectations" except in the areas of punctuality, setting appropriate priorities, completing assignments in a timely manner and work quality, where he "needs improvement."  *Id*.  According to the performance appraisal, Otsyula was "frequently late to work," though he adhered to time tracking protocols, and further indicated that he should "endeavor to improve" his ability to juggle his workload and manage the timelines inherent in the permitting process he was responsible for.  *Id*, pp. 1-2.

In July 2005, Mike Morales ("Morales") became the Western Region Operations Manager for DSL.  Morales Aff., ¶ 1.  His duties included supervising Otsyula.  *Id*, ¶ 2.  When he took over as Otsyula's supervisor, Morales was aware of the performance issues identified by Dickason.  *Id*, ¶ 5.  Morales approved an alternate work schedule of 9:00 a.m. to 6:00 p.m. for Otsyula who commuted to work from Portland.  *Id*, ¶ 3.  Later that same month, Otsyula requested, and Morales approved, a 9:30 a.m. to 6:30 p.m. work schedule.  *Id*, ¶ 3 & Ex. 1.

Otsyula states that in July 2005, Morales wanted to extend his probationary period by three months because Morales believed that, as a Kenyan, Otsyula "had no respect for women."[2] Otsyula Decl., ¶ 5.  Morales admits requesting a one-month extension when he began supervising Otsyula, but only for the purpose of creating an opportunity to evaluate Otsyula's work performance for himself and not based on any discriminatory view of Otsyula.  Morales Decl., ¶ 1.  Otsyula also states that in July or August 2005, Morales told him he was "hired for diversity."  Otsyula Decl., ¶ 6.  Morales denies saying this and adds that because "[Otsyula] was hired before I became his supervisor, . . . I do not know and am unaware if he was hired for diversity.  I believe [Otsyula] was hired because he was qualified for the position."  Morales Decl., ¶ 2.

On August 31, 2005, Morales issued a memorandum to all Resource Coordinators outlining his expectations regarding work scheduling because "it had become overly difficult to track and monitor Resource Coordinators."  *Id*, ¶ 4.  He required all Resource Coordinators to work from 8:00 a.m. to 5:00 p.m. unless granted special permission, and gave specific instructions on scheduling and taking leave and on notifying the office of tardiness.  *Id*, Ex. 2.  He granted Otsyula special permission to work his altered schedule.  *Id*, ¶ 4.

On May 3, 2006, Morales issued a letter of reprimand to Otsyula for failing to maintain acceptable work performance, attend scheduled mandatory meetings, and arrive to work on time.  *Id*, ¶ 6, Ex. 3.  Morales noted that this was a "continuing problem" that he had discussed with Otsyula, his union representative and the human resources manager at a meeting held the

---

[2] Elsewhere, Otsyula asserts that this proposed extension was for six months.  Plaintiff's Objections to Defendant's Concise Statement of Material Facts and Further Assertion of Material Facts, ¶ 15.

4 - FINDINGS AND RECOMMENDATION

previous week.  *Id*, p. 1.  On May 30, 2006, the same parties attended another meeting to discuss

an unauthorized absence and on-going performance issues.  *Id*, ¶ 7.  Because Otsyula expressed a

willingness to improve, Morales chose not to pursue further discipline.  *Id*.  Instead, Morales

issued another letter to Otsyula dated June 5, 2006, outlining the understanding reached at the

meeting with respect to various work expectations including the timeliness of his work

assignments, the completion of past due work, and the proper method for notifying DSL if

Otsyula was going to be late or was sick.  *Id*, ¶ 8, Ex. 4.

     Around this time, Otsyula contacted his union representative to complain of the disparate

treatment he believed he was receiving as compared to other Resource Coordinators with respect

to the terms and conditions of his employment.  Otsyula Decl., ¶ 21.  The union filed a grievance

on his behalf on July 25, 2006.  *Id*, Ex. 1. This grievance asserted that Otsyula was being treated

differently from other employees with regards to standards of attendance and the quality and

timeliness of his work product.  *Id*.

     According to Morales and DSL Director Louise Solliday ("Solliday"), Otsyula's

performance, attendance, and punctuality did not improve in accordance with the expectations

and understandings addressed in the May 2006 meetings.  Morales Decl., ¶ 9; Solliday Aff.,

¶¶ 3-4.  Because Otsyula continued to be tardy, on August 24, 2006 Morales changed Otsyula's

schedule back to DSL's normal business hours of 8:00 a.m. to 5:00 p.m., and placed further

restrictions on his ability to adjust his work schedule outside of these hours.  Morales Aff., ¶ 10

& Ex. 5; Solliday Aff., ¶ 6 & Ex. 2, p. 7.  On September 1, 2006, Solliday issued a two month

pay reduction to Otsyula due to his lack of improvement since the May 3, 2006 Letter of

Reprimand.  Solliday Aff., ¶ 3 & Ex. 1.  At the time the letter was issued, Otsyula was behind on

28 permit applications and had continued to arrive late on a regular basis. *Id*, ¶¶ 4, 5 & Ex. 1.

The letter instructed Otsyula that his "repeated failure to follow your supervisor's instructions,

meet required permitting deadlines and continued tardiness in arriving to work, attending

meetings and other scheduled events is not acceptable" and warned him that further failure to

meet DSL's expectations "[would] result in further disciplinary action up to and including

removal from State service." *Id*, Ex. 1, p. 8. In spite of this warning Otsyula arrived late to work

on 15 days in September 2006. *Id*, Ex. 2, pp. 7-9.

On October 10, 2006, Solliday notified Otsyula that DSL would hold a "Pre-Dismissal

Process/Meeting" on October 14 to provide him with an opportunity to refute facts or present

mitigating evidence before DSL made a final decision whether to terminate his employment. *Id*,

¶ 6 & Ex. 2. At that hearing Otsyula complained of "a continuous pattern of discrimination

because of race from the beginning up to now and disparate treatment continuously – a very

hostile work environment." *Id*, ¶¶ 7-8, Ex. 4, p. 2. Immediately after this statement, he

continued: "But to the extent that I loved my job, I – I really appreciative of having the

opportunity to clear communication [*sic*] because [Morales] is a great person to work with." *Id*.

DSL asserts that this was the first time Otsyula made an allegation of race discrimination. *Id*,

¶ 8.

On November 17, 2006, Solliday issued a letter to Otsyula notifying him of his dismissal

from DSL employment, effective as of that day. *Id*, ¶ 9, Ex. 3.

Otsyula was the only black Resource Coordinator at DSL during his tenure. Otsyula

Decl., ¶ 8. He asserts that he was treated differently from the other Resource Coordinators as no

one else was required to arrive and leave at a specific time, keep track of their hours, or notify

the office if they were going to be a few minutes late.  *Id*, ¶¶ 9-14; Otsyula Depo., pp. 60-61.  He

had a heavier work load than other Resource Coordinators yet processed applications at a similar

rate.  *Id*, ¶¶ 17-19.  He was the only one repeatedly chastised and reprimanded by Morales and

was the only one who had to work exclusively within the office.  *Id*, ¶ 19.  Despite DSL's

assertion to the contrary, Otsyula claims he brought all of his permit applications current after

the May 3, 2006 letter of reprimand.  *Id*, ¶ 20.

## FINDINGS

Otsyula brings three claims pursuant to Title VII of the Civil Rights Act of 1964 which

provides that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire

or to discharge any individual, or otherwise to discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin"  42 USC § 2000e-2(a)(1).  He alleges claims for

disparate treatment, hostile work environment, and retaliation based on his race and national

origin.

## I.    Disparate Treatment

### A.    Legal Standards

Disparate treatment occurs when an employee "'is singled out and treated less favorably

than others similarly situated on account of race.'"  *Cornwell v. Electra Cent. Credit Union*, 439

F3d 1018, 1028 (9th Cir 2006), quoting *McGinest v. GTE Serv. Corp.,* 360 F3d 1103, 1121 (9th

Cir 2004).  In order to prevail, Otsyula must prove by direct or circumstantial evidence that

DSL's actions had a discriminatory motive.  *Washington v. Garrett*, 10 F3d 1421, 1431-32 (9th

Cir 1993), citing *Pejic v. Hughes Helicopters, Inc.*, 840 F2d 667, 672 (9th Cir 1988).  Where

direct evidence of discriminatory intent is unavailable, Otsyula may raise an inference of discrimination under the burden-switching framework of *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973).  Under this framework, Otsyula may establish a *prima facie* case of disparate treatment by offering proof that:  (1) he belongs to a class of persons protected by Title VII; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) DSL treated him differently than similarly situated employees not belonging to the same protected class.  *Cornwell*, 439 F3d at 1028, citing *McDonnell Douglas*, 411 US at 802.  "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994).

Establishing a *prima facie* case creates a presumption that DSL acted with discriminatory intent.  *See Cornwell*, 439 F3d at 1028 (citation omitted).  DSL may rebut this presumption by producing admissible evidence showing a "legitimate non-discriminatory reason" for the action.  *See id* (quotation, citation omitted).  At that point, the presumption created by the *prima facie* case "'drops out of the picture'" and Otsyula must prove that the proffered reasons are a "pretext" for invidious discrimination.  *See id.*  To do this, Otsyula must show either "that [DSL's] proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable" or "that unlawful discrimination more likely motivated [DSL]."  *See Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F3d 1115, 1127 (9th Cir 2000) (citation omitted).

///

///

**B.** **Analysis**

Otsyula's disparate treatment claim fails because he has not demonstrated a *prima facie* case of discrimination. Moreover, the evidence is insufficient to create a genuine issue of fact that DSL's justifications for its actions are pretextual.

Otsyula has presented evidence to show that he meets the first, third and fourth components of the *prima facie* case, but not the second. Being both black and Kenyan, Otsyula is a member of a class protected by Title VII. 42 US § 2000e-2(a)(1). He suffered adverse employment actions including: receiving a letter of reprimand; being subjected to an unusual and singularly high level of scrutiny and control including being required to arrive at 8:00 a.m., to call if running late, and to gain approval to leave for field work; receiving a temporary reduction in pay; and being terminated. *See Fonseca v. Sysco Food Svcs. of Ariz., Inc.*, 374 F3d 840, 847 (9th Cir 2004) ("We define 'adverse employment action' broadly.") (citing cases). Otsyula was the only black Resource Coordinator and was the only Resource Coordinator subjected to discipline and termination for arriving late to work and failing to complete projects on time.

Nevertheless, Otsyula's *prima facie* case fails because Otsyula has failed to present any evidence to show that his work performance was satisfactory during the duration of his employment with DSL. DSL has presented unrefuted evidence that Otsyula's work performance was deficient in the areas of punctuality and the timeliness and quality of his work product. These problems continued throughout the entire duration of his employment. This evidence also shows that Otsyula was unable or unwilling to alter his performance and behavior even after DSL gave him multiple opportunities to do so. Morales granted Otsyula's request to arrive at

9:00 a.m. and later at 9:30 a.m. so that he would have time to take his daughter to school and

commute from Portland.   Nevertheless, he continued to be late and miss or arrive tardy to

mandatory meetings.  Otsyula's problems with the timeliness and quality of his work product

caused DSL reduce to his work load to allow him to catch up.  Even with this accommodation,

he continued to lag behind in processing applications in a timely fashion.  Solliday Aff., ¶¶ 4-5

& Exs. 1 & 2.  Perhaps most telling is the fact that after being warned on September 1, 2006, that

further tardiness and poor work performance could result in his termination, Otsyula was

nevertheless late by at least 15 minutes on at least 15 days that month.

        In response, Otsyula contends that his work performance was equal to that of other

Resource Coordinators and that DSL's performance complaints are merely being offered as

pretext for their intentional discrimination.  However, "an employee's subjective personal

judgments of [his] competence alone do not raise a genuine issue of material fact."  *Bradley v.*

*Harcourt, Brace and Co.*, 104 F3d 267, 270 (9th Cir 1996), citing *Schuler v. Chronicle Broad.*

*Co., Inc.*, 793 F2d 1010, 1011 (9th Cir 1986).  Other than his conclusory allegations, Otsyula has

submitted no evidence from which a jury could conclude that his performance or behavior was

similar to other Resource Specialists.  "Conclusory allegations unsupported by factual data

cannot defeat summary judgment."  *Rivera v. Nat'l R. R. Passenger Corp.*, 331 F3d 1074, 1078

(9th Cir 2003), citing *Arpin v. Santa Clara Valley Trans. Agency*, 261 F3d 912, 922 (9th Cir

2001).

         Otsyula has submitted a union grievance which refers to the union's examination of "the

published statistics for applications received," showing that his performance and work product

did not "differ remarkably" from that of other Resource Coordinators "except in one area,

compliance with 'statutory' timelines."  Otsyula Decl., Ex. 1, p. 6.  The union representative

complains that DSL has failed to make time records of other employees available to permit a

similar comparative analysis of leave usage.  "Nevertheless," he asserts, "Otsyula has . . .

complied with restrictions on his leave, arrival and departure times that do not appear to be in

effect for other employees."  *Id*.  However, this advocacy by Otsyula's union representative is

inadmissible hearsay under FRE 801.  In order to survive summary judgment, Otsyula must

provide admissible evidence opposing his supervisors' claim that he failed to meet their

legitimate work expectations.  *See* FRCP 56(e)(2).  He has failed to do so despite the fact that

this court specifically advised him of this obligation (docket #44).  Without seeing the statistics

relied on by the union, it is impossible for this court or the fact-finder to determine how similar

or different his performance was from his co-workers.  Furthermore, Otsyula has not submitted

any declarations by, or deposition excerpts of, his union representative or coworkers in support

of his claims.  Thus, no admissible evidence refutes DSL's contention that Otsyula failed to

perform his job satisfactorily.

Even if Otsyula's conclusory allegations were sufficient to establish a *prima facie* case

of disparate treatment, DSL has offered a legitimate non-discriminatory reason for its actions.  In

response, Otsyula has failed to provide any evidence of pretext.  Otsyula received a written

reprimand due to his continued attendance and work product problems.  He was returned to an

8:00 a.m. to 5:00 p.m. schedule and subjected to strict schedule controls due to his continued

tardiness and failure to attend mandatory meetings or produce satisfactory work product while

working his approved 9:30 a.m. to 6:30 p.m. schedule.  He received a two-month reduction in

pay because he continued to arrive late and to produce a poor work product in violation of

Morales' orders.  Finally, he was terminated because he repeatedly failed to meet the

expectations of DSL management to such a degree that Solliday labeled his actions

insubordination.  Solliday Aff., ¶ 6, Ex. 2, pp. 7-9.  Otsyula's poor work performance, tardiness

and insubordination are legitimate justifications for DSL's actions.

Otsyula argues that he has produced evidence that unlawful discrimination more likely

influenced (*i.e.* were pretext for) his supervisors' actions.  Specifically, he alleges that Morales

wanted to extend his probationary period (presumably the period in which his position was

labeled "limited duration") because Morales believed that, as a Kenyan, Otsyula was

disrespectful towards women, and that Morales told him that he was only hired due to his

minority status.  Accepting these allegations as true, despite Morales' denial, a reasonable jury

could not find under the circumstances of this case that DSL intentionally discriminated against

Otsyula.

Several factors contribute to this determination.  First, the adverse employment actions

taken by Morales occurred long after he is alleged to have made these comments, and the

intervening positive treatment of Otsyula by Morales breaks this very tenuous chain of causation.

The alleged comments were made in July or August of 2005, and Morales issued a letter of

reprimand on May 3, 2006, approximately nine months later.  He placed Otsyula on a restricted

schedule on August 24, 2006, over a year later.  Nevertheless, around the same time as the

alleged comments, Morales granted Otsyula's request for a special work schedule.  In addition,

on August 15, 2005, Otsyula was transferred from a limited duration to a permanent Resource

Coordinator position at the end of his probationary period.  Solliday Aff., ¶ 3, Ex. 1, p. 1.  These

beneficial employment actions break any causal chain between the alleged comments and the

12 - FINDINGS AND RECOMMENDATION

May 3, 2006 reprimand.  Despite having disciplined Otsyula May 3, less than a month later on

May 31, 2006, Morales chose not to impose additional discipline on Otsyula for his continued

performance problems in view of the positive attitude and commitment to follow procedure he

expressed at a meeting with management.  This further dissolves any link between Morales'

alleged comments and the August 24, 2006 action.

Second, the most significant discipline Otsyula suffered (pay reduction and termination)

was imposed by Solliday, not Morales.  Otsyula has produced no evidence whatsoever that

would show that her actions were motivated by discriminatory intent.

### C. Conclusion

Because Otsyula cannot demonstrate a *prima facie* case or prove that DSL's justifications

for taking adverse actions against him are pretext, DSL's motion should be granted and his

disparate treatment claim should be dismissed.

## II. Hostile Work Environment

### A. Legal Standards

To state a *prima facie* case for his hostile work environment claim, Otsyula must raise a

triable issue of fact as to whether:  (1) he was subjected to verbal or physical conduct based on

his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or

pervasive to alter the conditions of his employment and create an abusive working environment.

*Surrell v. Ca. Water Serv. Co.*, 518 F3d 1097, 1108 (9th Cir 2008), citing *Manatt v. Bank of Am.,*

*N.A.*, 339 F3d 792, 798 (9th Cir 2003).   Title VII is not a "general civility code" and "simple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment.'"  *Faragher v. City of Boca*

*Raton*, 524 US 775, 788 (1998) (quotations, internal citations omitted).  Even "the 'mere

utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' is not,

by itself, actionable under Title VII."  *Ellison v. Brady*, 924 F2d 872, 876 (9th Cir 1991), quoting

*Meritor Savings Bank v. Vinson*, 477 US 57, 67 (1986).  "[T]he required showing of severity or

seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the

conduct." *Id* at 878 (citation omitted).

    **B.**    <u>**Analysis**</u>

    Otsyula makes the following allegations in support of his hostile work environment

claim:  (1) Morales' July 2005 remark that as a Kenyan he had "no respect for women;"

(2) Morales' July or August 2005 remark that he was a "minority hire;" (3) Morales'

requirement that he call in when he was going to be late; (4) Morales forcing him to work in the

office rather than do field work; (5) being placed on administrative leave; (6) being denied

training opportunities; and (7) being terminated.

    As discussed above, Otsyula has failed to demonstrate that any of these adverse

employment actions were motivated by discriminatory intent.  Moreover, two offensive and

insensitive remarks concentrated in a one-month period of time and followed by approximately

18 months of no reported conduct do not suffice to establish a hostile work environment claim.

*See Manatt*, 339 F3d at 798-99 (finding that "two regrettable incidents [of racially offensive

behavior] occurring over a span of two-and-a-half years, coupled with the other offhand remarks

made by [plaintiff's] co-workers and supervisors, did not alter the conditions of [plaintiff's]

employment"); *Vazquez v. County of Los Angeles*, 349 F3d 634, 642-44 (9th Cir 2003) (finding

no hostile work environment where employee was told he had "a typical Hispanic macho

attitude," should perform well as a field worker because "Hispanics do good in the field" and was yelled at in front of others); *Kortan v. Ca. Youth Auth.*, 217 F3d 1104, 1108–11 (9th Cir 2000) (finding that referring to a former female supervisor as a "castrating bitch" or "madonna" or "regina" and to the plaintiff as "Repunzel" and "Medea" was offensive, but not sufficiently severe or pervasive so as to alter the terms and conditions of the plaintiff's employment). Furthermore, at his pre-dismissal hearing, Otsyula stated that Morales was "a great person to work with."  This is inconsistent with his current contention that Morales created an intimidating and hostile work environment.

### C.    Conclusion

Otsyula has failed to show that he was subjected to conduct that was so severe and pervasive that it altered the terms and conditions of his employment.  DSL's motion should be granted and his hostile work environment claim should be dismissed.

## III.    Retaliation

### A.    Legal Standards

The retaliation provision of Title VII makes it an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 USC § 2000e-3(a).

As a disparate treatment claim, claims for retaliation under Title VII are analyzed using the *McDonnell Douglas* burden-shifting framework.  *Stegall v. Citadel Broad. Co.*, 350 F3d 1061, 1065-66 (9th Cir 2003).  To establish a *prima facie* case of retaliation, Otsyula must establish that:  (1) he engaged in a protected activity; (2) DSL subjected him to an adverse employment action; and (3) a causal link exists between his protected activity and the adverse

employment action.  *Manatt*, 339 F3d at 800; *Kortan*, 217 F3d at 1112.  "To show the requisite

causal link, the plaintiff must present evidence sufficient to raise the inference that her protected

activity was the likely reason for the adverse action."  *Cohen v. Fred Meyer, Inc.*, 686 F2d 793,

796 (9th Cir 1982) (citations omitted).  "[A] prima facie case may be inferred from circumstantial

evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and

the proximity in time between the protected action and the allegedly retaliatory [activity]."

*Yartzoff v. Thomas*, 809 F2d 1371, 1376 (9th Cir 1987).

　　　　If Otsyula establishes a *prima facie case*, the burden then switches to DSL to produce a

legitimate, non-discriminatory reason for its actions.  *McDonnell Douglas*, 411 US at 802.  If it

does so, Otsyula must adduce a triable issue of fact that DSL's justifications are a mere pretext

for its invidious discrimination.  *Yartzoff*, 809 F2d at 1377.

　　　　**B.**　　**Analysis**

　　　　Otsyula contends that he engaged in the protected activity of opposing DSL's

discriminatory practices by filing a grievance and asserting that he was being discriminated

against on the basis of his race at his pre-dismissal hearing.　 DSL concedes that the second

complaint could be viewed as protected activity, but denies that Otsyula's union grievance was

specific enough in its allegations to qualify as the same.　 DSL asserts that because the union

grievance does not assert that his disparate treatment was due to racial discrimination, it cannot

serve as protected activity, and that the first time it heard any allegation of racial discrimination

was at Otsyula's pre-dismissal hearing.

　　　　The union grievance filed on July 24, 2006, asserts that DSL was subjecting Otsyula to

disparate treatment, but does not state that he believed that it was due to his race.  Rather the

16 - FINDINGS AND RECOMMENDATION

grievance asserts that it is the result of "continued disparate pressure on Mr. Otsyula, which appears to be unjustified, stemming from [his] original reprimand." Otsyula Decl., ¶ 21, Ex. 1, p. 1. It also claims that the May 3, 2006 Letter of Reprimand was not for "Just Cause" as required by the collective bargaining agreement. *Id*, p. 2 . According to the grievance, there was no evidence of misconduct because "Mr. Otsyula is being held to disparate rules from other employees in attendance and in both the quality and timeliness of his work product" and DSL had failed to demonstrate that the rules he was held to reasonably related to the operations of the agency. Conspicuous by its absence is any mention of the allegedly discriminatory comments made by Morales in July or August 2005. This is surprising because these allegations would seem to be highly relevant to an assertion of disparate treatment in a grievance proceeding.

An employee need not "be aware that [a] practice is unlawful under Title VII at the time of the opposition in order for opposition to be protected." *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F2d 1149, 1157 (9th Cir 1982). However, because Title VII only protects opposition of "any employment practice made unlawful" by Title VII, it would be logical to conclude that where an employee asserts that he is being treated differently, but does not assert that it is because of his race, he has not engaged in activity protected by Title VII. *See, e.g., Learned v. City of Bellevue*, 860 F2d 928, 932 (9th Cir 1988) ("the opposition clause, by its terms, protects only those employees who oppose what they reasonably perceive as discrimination *under the Act*") (emphasis in original) (holding that an employee's action of filing an excess damages claim under state industrial insurance laws and opposition to what he perceived as discrimination based upon his physical and mental limitations was not protected activity under Title VII); *Barber v. CSX Distribution Servs.*, 68 F3d 694, 701-02 (3rd Cir 1995) (holding that a letter which

17 - FINDINGS AND RECOMMENDATION

complained about unfair treatment in general but failed to specifically complain about age

discrimination was not protected conduct for a *prima facie* case of retaliation under the ADEA).

However, this court need not resolve this issue.  Even if both of Otsyula's complaints are

protected, his claim still fails because he cannot prove a causal link between these complaints and

any adverse employment action and that DSL's legitimate justifications for taking these actions

are pretext.

      With respect to establishing causation, Otsyula argues that the facts and circumstantial

evidence of intent are sufficient for a reasonable jury to determine that his termination was the

result of whistleblower retaliation.  He also asserts that direct evidence is not required because it

is rare in whistleblower retaliation cases.  While Otsyula need not point to direct evidence of

retaliation in order to survive summary judgment, it is his burden to "identify with reasonable

particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F3d 1275,

1278 (9th Cir 1996) (citation omitted).  He fails to specify which facts and circumstantial evidence

of intent support an inference of retaliatory intent.

      This court can surmise only that Otsyula relies upon the proximity between his protected

conduct and the adverse employment actions to raise an inference of retaliatory intent.  *See*

*Coszalter v. City of Salem*, 320 F3d 968, 977-79 (9th Cir 2003).  The time periods at issue in this

case would easily fall within those periods found acceptable in other cases in this circuit.  Otsyula

filed his grievance in late July 2006 and was placed on a modified schedule in late August, given

a pay reduction in September and terminated in November within weeks of raising another

complaint of disparate treatment and harassment.  *See id* at 977-78 ("Depending on the

circumstances, three to eight months is easily within a time range that can support an inference of

retaliation."). Nevertheless, "a specified time period cannot be a mechanically applied criterion." *Id* at 977. Indeed, "[t]here is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation." *Id* at 978. Rather, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Id*. As here, "[i]n some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive[.]".

This case presents just such a clear picture. DSL has submitted overwhelming evidence of the uninterrupted problems with Otsyula's tardiness and the timeliness and quality of his work product. The record shows progressively increasing levels of correction and discipline as Otsyula failed to comply with the legitimate expectations of his employer. Finally, after repeatedly and directly violating the clearly expressed command that he arrive to work on time, he was given a pre-dismissal hearing and terminated.

Even granting Otsyula the benefit of the doubt and finding that he has presented a *prima facie* case by inferring causation from timing alone, Otsyula cannot provide any evidence to refute DSL's legitimate justification for its actions. As discussed above, DSL asserts that each adverse action was taken only in response to Otsyula's uncorrected performance issues and for no other reason. In the face of the well documented progressive disciplinary history, Otsyula has failed to provide any evidence that would support an inference that DSL's explanation is pretext. Other then the mere fact that he engaged in protected conduct and was subjected to disparate treatment there is no evidence from which a reasonable juror could conclude that DSL's

explanation is unworthy of credence or otherwise not believable, or that DSL was more likely motivated by unlawful discrimination.  Thus, his claim also fails at the pretext level of the analysis.  *See Wallis*, 26 F3d at 890-91 ("[W]hen evidence to refute the defendant's legitimate explanation is totally lacking, summary judgement is appropriate even though plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption.").

    **C.**    <u>**Conclusion**</u>

Because Otsyula cannot demonstrate a *prima facie* case or prove that DSL's justifications for taking adverse actions against him are pretext, DSL's motion should be granted and his retaliation claim should be dismissed.

<u>**RECOMMENDATION**</u>

Otsyula has failed to demonstrate that a genuine issue of material fact exists for any of his claims.  Therefore, the court should GRANT DSL's motion for summary judgment.

<u>**SCHEDULING ORDER**</u>

Objections to the Findings and Recommendation, if any, are due October 20, 2008. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

///

///

///

///

///

## <u>NOTICE</u>

This Findings and Recommendation is not an order that is immediately appealable to the

Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of

Appellate Procedure, should not be filed until entry of a judgment.

DATED this 30th day of September, 2008.


/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

21 - FINDINGS AND RECOMMENDATION